First case this morning is People v. Bruce Graves for the appellant, Mr. Martinkus, and for the applicant, Ms. Brooks. You may proceed. Good morning, judges. I represent Bruce Graves. It seems to me that before someone is sentenced to five years in jail like Mr. Graves, he should get a fair shake of trial. And I'm here to tell you that he didn't get a fair shake of trial. I've set forth, obviously, eight different reasons in my brief that I ask that you consider. I'm not going to have time to go through them all. But on May 2nd, 2009, Mr. Graves was driving a vehicle in Champaign County, Illinois. He was at the corner of Windsor and Staley. Those are two main arteries in Illinois, kind of outside the main portion of the city. Officer Walsh was apparently behind him. He made a turn. Officer Walsh felt it was too wide. He followed him about a half a mile, and Mr. Graves pulled into his driveway. What's significant there is that trial, I asked Officer Walsh very specifically, while driving, was there anything you observed while driving that would give you any reason to believe that Mr. Graves had committed a DUI? And he was honest. He said, no, there was not. Officer Walsh, at that time, decides to turn over the investigation to Officer Rich. Officer Rich was a relatively new officer. He'd never conducted HGN tests before, horizontally engaged in a stagnant test before. And really, this was his first opportunity, I think, to actually go through this. The first thing that we claim as error in this case is when we had Officer Walsh on the stand, the state's attorney asked questions, I asked questions. Then the state's attorney asked additional questions on redirect examination. Included in those questions was, for the first time, questions directed to Officer Walsh concerning field sobriety testing. Several different questions were asked, training, what do these mean, and so forth. When Officer Walsh then got off the stand, Judge Klaus turned to the state and said, call your next witness. I said, Judge, I have a few questions for recross. I can honestly tell you, in 34 years of trying hundreds and hundreds of jury trials, I've never been in a position where a judge simply said, basically, no, I'm not going to give you any recross examination. I know he has discretion, but I believe the cases I cite do indicate he's supposed to exercise that discretion. He didn't exercise any discretion here. In my view, he had a blanket policy that I was unfamiliar with. It's shocking to me that... Were any of the questions on redirect new information or new areas of inquiry? Absolutely, Judge. If you look at it, Andrew Bergstrom asked for the first time, now, Officer Walsh, you've had training about field sobriety tests, and she asked questions about field sobriety tests. Never had been asked at all. Not one question that I recall that's in the record was brought up. So now, for the first time, it's raised, and what you have to really understand is this becomes a really crucial area, because up to that point, there's nothing based upon his driving. Officer Walsh is pretty candid that would give rise to a finding of DUI. So now we're looking at how these tests are going to be conducted. Can the jury, based upon these tests, make the inference that on his inability to do these things, he's built a DUI? So I think it was very important from the very onset that I have a chance to ask questions about... Now, would we be incorrect to say that the court indicated it would permit recourse examination for a new ground that had been covered on redirect? Yes, but it was an empty promise, Judge. He said that, but then there was a new ground, namely field sobriety tests. I pointed it out to him, and it didn't matter. You know, when they did me off for proof, he said, basically, why are you wasting my time? So, you know, words are one thing, context and meaning is another. Judge Klaus was absolutely adamant that it was his policy he wasn't going to give any recourse to a defense counsel. And that's a serious thing, especially in a case such as this. This is a case where you're looking at what the officers did on field sobriety testing to submit to the jury that's going to be used to decide whether this gentleman was or was not guilty of this act. So from the very beginning, we have a situation in which I don't get to ask any questions to Officer Wall regarding field sobriety tests. Then you move on to Officer... Did Officer Wall, was he the one that conducted the field sobriety tests? He was not, Judge. He was not. What's so important about that? Well, I think what's important is this. When you have a jury for the first time hearing questions and answers from a police officer about field sobriety tests, if I don't get an opportunity to clarify and make my points about field sobriety testing at the time this is being offered, it puts me at a disadvantage where the jury has heard all this, heard this information, without any opportunity to cross-examination. Cross-examination is one of the keys that a defendant has. If you limit or bridge cross-examination, and it's not just me. If you look at Dombofsky and Garambi County National Bank, those cases stand for the proposition that the refusal of a trial court to permit re-cross-examination as a matter of right, that's a matter of right when new things are being introduced for the first time and redirect. It's reversible error. Because I think our courts, including the Fourth District, has found that that is the best test for someone who's in my client's position. I can't vigorously cross-examine the officers, and he doesn't get a fair shake. And that's what happened here. But more importantly, if you move on to Officer Rich, Officer Rich comes in and testifies that he had never had a traffic stop involving DUI in which he administered horizontal gaze-distagnance testing. You are allowed to fully cross-examine Officer Rich, aren't you? Well, not really. Why not? Because Judge Klaus limited my cross-examination. He, if I remember, stopped me when I asked him about the effect of nystagmus and optokinetic something. I don't remember the word now. It's a medical term that was indicative of horizontal gaze-dystagmus. And I didn't make these questions up. I was asking what is important to determine if this test meets the Frye standard. So I wasn't making this stuff up. These were all different questions and inquiries that the Supreme Court looked at. Well, I got through about half of them. I'm not going to say I didn't get a lot of questions. Yes, I did. But when you're star witness, when you're submitting Officer Rich for the purpose of saying this is a scientific exam that has meaning, and jurors are listening to this and they accept it, I should highlight the fact that he doesn't even know what resting nystagmus is. I mean, this testimony should never have been admitted. The Supreme Court in the comments says you've got to look at the Department of Transportation standards, NHTSA standards, one of which is Step 4. Step 4 says an officer must have shown that in the past he's been able to understand what resting nystagmus is. He's just got to look for it. And then in this case, you have to prove also that Officer Rich examined for resting nystagmus. Well, Judge, he didn't know what it was. I mean, it was pretty numbing, I'll be honest with you, when Officer Rich said he didn't know what it was. So how could he possibly meet Step 4? And then when he didn't know what it was, then even I know the state's attorney was shocked when he said, well, yeah, I watched at the start here, and Mr. Gray's eyes were moving back and forth. Clearly the definition of what jerking is at rest. So here we have an officer who doesn't know what it is, but describes the event, which clearly gives rise that it was nystagmus, which basically makes the entire test worthless. Once you show that, in fact, the gentleman has resting nystagmus, that means that his make of his constitution medically is such that the inferences to be drawn, if he also shakes upon maximum deviation, are gone. And that's the whole point of this thing, that if someone has resting nystagmus, the inferences that an officer can draw that, oh, he must have been impaired, and opine to the jury, based upon my test, yes, I have an opinion that he was impaired due to alcohol. That's not what McCown says. That's a scary proposition, because if the state doesn't have to have an officer who can say, yeah, I'm familiar with these 10 steps, I looked for them, I looked for nystagmus in resting, no, he didn't have it, then I went and I performed the test, fine. That's part of a, that's okay. But in this case, not only does Rich know really what he's doing, but he describes facts that certainly tell me that this was a horrible candidate for someone to take the horizontal case of nystagmus test. Well, the jury heard all this, right? They did, Judge. They heard your argument. They did. Yeah. Why can't the jury weigh that? Because I think before one gets to weigh the evidence, the court is the gatekeeper, and I think that's what they talk about under Frye. The court has to make the initial determination. Can we allow a jury to be persuaded on testimony that's not competent? And that's why you can't give it to the jury to weigh, Judge, because it wasn't competent. There was no basis to give it. This gentleman, this officer, didn't know what resting nystagmus was. My client observed it at rest. So now if you let him opine, oh, yeah, I still think, notwithstanding all that, it goes to the weight. It doesn't go to the weight in this case. It goes to the underlying theory, the underlying premise upon which the test is given. It's a fundamental difference. That's why in the count, if you read the count, unless you prove, it's the burden of the state to show the officer complied and comported with these ten requirements, and he didn't comport with four, he could never have done it, didn't even know what it was. That's not something that a jury should be able to look at, because Officer Rich could be compelling for a lot of reasons, but if he doesn't know what he's talking about, it's balderdash. It's poppycock. It's nothing. And that's really what took place here. So, again, I think there's a couple arguments related to that. One, it should have been admitted. Once it was admitted for weight, I should have been allowed a lot of latitude in terms of what in fact happened and how I could test that opinion. So I really do think that my client really did not get a fair shake in that aspect as well. Then we move on, and then you get to the closing argument, and there's two or three things that I'm troubled by. I was always taught and had experience that when you're in trial, I can't completely republish. I remember my first medical malpractice case in Cook County. I tried to do that, and Judge Fleischman said, you can't do that, people versus will. I tried to read the transcript. Well, in this case, it was not just reading the transcript. It was physically setting up the apparatus and putting it in front of the jury and the prosecutor for about ten minutes going through mainly the field sobriety performance of Officer Rich, this 23-year-old strapping, well-built gentleman who had no problem setting the standard for walking in a straight line and raising your legs without all these things. I objected and said that you can't republish evidence. You're supposed to go out and comment on the evidence. The response I got, and I said, if you do that, Judge, if you're going to republish this evidence, let them see the whole tape. At least have the benefit of the entire tape. Judge Klaus's remarks to me, it's in the record, said, well, here's your choice. You can put in the whole record, but then you're not going to have any time to make any argument to the jury. I mean, I don't understand. Why was there this rush to not permit my client to have the benefit of the entire tape if you're going to err, in my view, and permit republication? But to put me in that dilemma, where now I have to suffer the consequence if I want the whole tape shown, oh, I don't get any closing argument. I mean, it's just not right. It's fundamentally not right. You wanted to show the tape during closing argument? I didn't want to do it, but when he permitted the state to do it, to show not just for the purpose of pointing one thing out or something, but to show large volumes of this tape, and mainly, again, Officer Rich's performance. So I said, Judge, if you're going to permit... The same rules applied to the state, right? If the state wanted to... The portions that the state showed got into the state's closing argument time, didn't they? I think so. The problem was that the portions that the state showed may not have consumed the entire amount, but to show the full tape probably would have. And the purpose of wholeness, again, you're republishing a significant portion of the evidence, not to allow me to play the full tape. How much of the tape was played during the trial? All of it was played up until the time after the arrest when he was in the squad car. Judge Klaus limited the tape to a couple minutes, if I remember, of him being in the squad car. But other than that, it was played, the entire tape. My other concerns were really these. Once he allowed the tape in and now the jury, in closing, gets to see Officer Rich make this performance and how well he does, I then try to tell the jury and ask the jury, well, you have to at least understand that if you're looking at a 23-year-old officer do these compared to middle-aged men, that some of this might have to do with physical ability. That wasn't permitted. I couldn't argue to the jury that it must consider the fact that these tests are also tests of agility, endurance, ability, all these things. I mean, I was pretty shocked, frankly, that I was precluded from making the argument at trial that age can affect performance. It's not just indicative of alcohol. It's many other factors. Well, was there ever a question asked by you of either of the police officers whether or not age has impact? Yes, sir. Officer Rich, I don't remember exactly what I asked, but yes, I asked him in testing his knowledge about what does it mean. I said, doesn't age affect and so forth. So, yes, I think it was clearly an evidence. And he answered yes? Yes. So, once again, here you're in a situation where the jury sees this entire tape, sees Officer Rich performing it. I try to point out that, hey, look, just because Officer Rich can do this, this isn't the standard barrier. This guy's young. He's in shape. But I'm shut down. The other thing that was troubling to me is I know that this court, Judge Steigman's opinion in 1981, I think it was 81, permits consciousness of guilt arguments. Okay? And I know that to me this is a little bit of a slippery slope. Accepting that, a state attorney could argue to a jury, you can infer from this that somehow Mr. Graves must have thought he was guilty of something. There's some inference of that. Now, I raise the issue of in a case involving absolute liability where a state of mind is irrelevant, I can't put in evidence as to his state of mind. Did he really, really mean to do this or not? But the state can argue his state of mind in terms of an absolute liability offense. But nonetheless, accepting that consciousness of guilt arguments permitted, I think it's a heck of a difference when counsel comes up and says, Mr. Graves knew he was intoxicated. This is a man who didn't testify, exercises Fifth Amendment right not to testify, and now the prosecutor's permitted to tell the jury what Mr. Graves knew. There was no evidence with respect to what Mr. Graves knew. He didn't testify. If you permit that sort of argument by a prosecutor, you might as well throw out the Fifth Amendment right because now a defendant's got to protect his ability to tell a jury what he knew and didn't know and what the facts were because otherwise the prosecutor gets to tell the jury what she believed was in his mind. Not an inference, not a consciousness of guilt, but what he knew. So, I mean, those are my main points on that. I'm going to move on to the last thing I really want to talk about, and that's the eavesdropping statute. You know, the eavesdropping statute, this was an interesting case because May of 2009, this occurs. August of 2009, the eavesdropping statute's amended. Prior to that, Exception 8 said an officer doesn't have to tell a defendant that he's being taped. Video and audio can be permitted under this exception during an investigatory stop. No problem. I agree. I had no complaints, no beef. All of that I didn't say anything to. But when they completed the stop, arrested him, put him in the back of the squad car, then have this camera with his face distorted because he's so close to it and so forth, and he's rambling on and saying things and muttering and all these things, well, that was troubling to me because, one, there was an amendment two months or three months after his arrest that specifically now made another exception. You can also not tell someone who's in the back of the squad car. And Judge Klaus said, oh, this doesn't really expand the law. It simply explains what it was. Well, Senator Hutchison, who put the bill in, clearly says right in the record, it's in the brief, that this bill is meant to expand the exceptions. I mean, I don't know what could be any clearer. This was not an exception under the Act in May of 2009. Hutchison says we're going to expand it and so forth as of August of 2009. And then Judge Klaus says, no, it doesn't expand it. It just clarifies it. Well, I mean, it can't be. It can't be. Did you refer to all of the matters that were indicated in the legislative history? I think so, Judge. Everything that I found relevant, I tried to get it in front of the court. But the main thing was, if you read the bill, it was pretty amazing to me that I found support for my position because right there, right at the start, Hutchison says, yeah, we know this wasn't something that existed. This expands it to permit this. Well, there was previously an eavesdropping exemption for simultaneous audio and video recordings. Yes, sir. But only in the investigatory style. And that's where it ended. Once you arrested the person, put them in the squad car, that was not an exception. An officer could not continue to do that. And that's what happens here. He doesn't know he's being taped in the back. Now, as of August of 2009, yes, you can. That's an exception, a new exception. Senator Hutchison says, we're expanding these exemptions. But Judge Klaus didn't see it that way, notwithstanding the clearly public language. And then finally, this is a guy who gets sentenced to five years in jail when the state offers, you know, asks for three. And I realize that sentencing is tough in terms of what a court looks at and so forth. But here's a case where clearly there was no consideration of probation. His father, you know, his father's got cancer. As a farmer, trying to help him, all those things. And I recognize that maybe some jail probation. What did records look like? A couple DUIs, Judge. This was his third DUI, so it wasn't great. Was it? Nothing else? You know what? I think he had some other minor thing. I don't remember, I'll be honest with you. He had several. Wasn't he in prison? He was. He was. And then it didn't help him to go to prison. True enough. I don't really quarrel with you on that. But my view is this. This is, you know, DUI is obviously very serious offenses. But when you put it in some perspective, I mean, this is a situation where the state, the voice of the people, asking for what's appropriate, and they're asking for three years, and Judge Faust gives them five. You know, again, I think that's something for you to look at. I think if you look at any one of these things individually. Take your time. You'll have some additional time. Thank you. May it please the Court and Counsel, my name is Anastasia Brooks, and I represent the people in this case. From the state's perspective, the most important central issue in this case is the harmless error rule, which applies because the evidence of guilt was overwhelming. Therefore, all the issues that the defendant identifies, even if he can show that any of them had merit, would not result in a reversal of his conviction. So for that reason, I'll start with this issue, the extent of the evidence. There was three main components to what the prosecution's case. Because this was a case in which the defendant refused breath testing, there was no, in fact, no chemical testing done. But, in fact, the inferences that can be drawn from the defendant's refusal of breath testing constitute an important circumstantial piece of guilt. As well as the pre-stop evidence, which is, not all of this was recorded. However, the officers did observe multiple traffic infractions, including a defense failure to stop at an intersection without slowing down even, and a wide turn into the opposite lane of travel, and then again veering into an oncoming lane a second time. I thought the officer testified there was no indication of DUI when he made the stop. Well, I think what counsel was referring to was the cross-examination of Officer Walls, in which it was specifically phrased as to what Officer Walls put in his report. And the fact that he may not have had probable cause to arrest for DUI at the moment of the traffic stop, before further investigation happens, does not mean that the significant and egregious traffic violations the defendant committed prior to the stop are not important pieces of circumstantial evidence that can be considered by the jury. So, for that reason, the attempted impeachment as to what Officer Walls put in his report, and the extent of probable cause that he had to arrest for DUI at the time, does not preclude the jury from considering those as important pieces of evidence, circumstantially. And then the officers' observations after the stop includes, starts at the beginning, the defendant was a bit confused, stumbled through papers, produced, I believe it was an expired card, had bloodshot eyes, extremely strong odor of alcoholic beverage, and the fact that he committed errors on alphabet and number-counting pre-exit tests. And what I counted from the testimony was at least five indicators in the heel-to-toe field sobriety test, and four indicators of impairment in the one-leg stand test. And those included, like, failure to maintain balance, raising and flailing of arms, failure to adhere to instructions, things like that. So, for those reasons, the evidence was, in fact, overwhelming, and all the errors would be considered harmless, even beyond a reasonable doubt. Now, as to the merits of the issues, the defense's primary issue seems to be the failure to allow recross, which it's not apparent from the record, the record doesn't support the defendant's claim that the trial court somehow had this policy of not permitting any recross examination. The trial court's remark makes apparent that the right to recross is conditioned on the prosecution bringing out new ground on redirect, and in the trial court's opinion, that was not done. Now, what is actually relied on is redirect was directed at the cross-examination. The cross-examination of Officer Wallace went to, essentially, why didn't you just arrest him for DUI if you had the probable cause to do so? And the redirect was to clarify that, well, police have to do a thorough investigation. And part of that thorough investigation was field sobriety testing, which was described as testing the ability to multitask. So field sobriety tests came up for the first time on cross? The reference to field sobriety testing was made and was described simply as the ability to multitask, as testing the ability to multitask. And then what the defense wanted to do was… Came up on redirect, rather. That was on redirect, except that what the defense really wanted to do was engage in this extensive recross examination, which would have exceeded the scope of what the prosecution even brought out on redirect. So there was another… The defense did not get to do any recross, right? Well, as to the reference to field sobriety testing, if the door was open at all, it was not open to the extensive recross examination that was presented in the offer of proof. I think the question is, was any recross allowed? No, there was no recross allowed, but that would have been prejudicial to the defendant because just the mere reference to the mention of field sobriety testing, because that had never been said before, now all of a sudden it's simply just those words are uttered, doesn't necessarily open the door to an extensive development of everything to do with field sobriety testing, which is what, according to the offer of proof, the defense intended to do. So the question should be not just what the defendant was prohibited from doing, but if you look at the Sixth Amendment right to recross examination, the question is not what he was prohibited from doing, but what recross examination was the defendant allowed. He was allowed a great amount of latitude on recross examination. So even if he can show an abuse of discretion, it would have to be prejudicial. It's not a violation of the Sixth Amendment right to simply limit one line of inquiry of recross examination if the defense otherwise has an adequate opportunity to confront the witness. So for that reason, he has to show prejudice and can't because any error would be harmless. And the main reason why he can't show prejudice is because every single question that he phrased in his offer of proof was in fact presented to the different witness, the one who actually performed the field sobriety testing, which would be the Officer Rich, which he had to testify next. So because all that information was presented to the jury, the only real complaint that the defendant now puts forward in the plight is, well, I didn't get to do it earlier, now the jury may have had some sort of first impressions that didn't get tested earlier in the case. But that seems to be a speculative ground of prejudice, particularly as strong as the case is, it couldn't possibly be prejudicial enough in order to get any relief. So with respect to the horizontal-gauge nystagmus, it seems like if Resnick's nystagmus was going to disqualify a subject from testing, it would seem that the manual that was produced by the National Highway Traffic Safety Administration should actually say so. But the defendant, he cites that manual, but he doesn't really show exactly where in that manual such a policy exists. Instead, it shows that, well, this is part of the procedure to look for it, but it appears to be more of an issue of officer safety. Because resting nystagmus can be indicative of things that make a subject more dangerous to that officer, particularly when the officer's trying to look at a subject's eyes and he has a weapon, and it's kind of a dangerous situation for officers. So if resting nystagmus is indicative of somebody who's drug-impaired, for example, that might be important for officers to know. That does not necessarily mean that that becomes a crucial administrative procedure step, that if detected means that he is disqualified from evaluative components. For example, a nystagmus onset before 45 degrees, et cetera. There was no evidence presented by the defense that that was in fact the case, that resting nystagmus, if detected, somehow makes these other tests useless. No expert testimony to that effect on the record, and even the case law of the state cited the Georgia case of Duncan, which said that resting nystagmus merely goes to the weight of the other horizontal gaze nystagmus tests. So it does not affect their visibility. And Rich did have some experience. He did the HDN test, not in the traffic stop context, but there was a homeless person, I think, on Green Street was referred to. So he had some experience, not only in police academy training, but prior practice experience. And Officer Wallace, the experienced officer on the scene, did confirm, in fact, that Officer Rich complied with all the administrative procedure steps of the NHTSA manual. So for that reason, there was sufficient foundation that evidence was properly admitted. The defense now claims that somehow a large volume of the tape was replayed, and I think there were about three parts. The very limited part, I think, was the driving, something to do with him getting out of the car, which was actually not prejudicial because it showed that he really didn't have any impairment in walking. But the main part was the field sobriety test performance. And those can be timed. I'm not sure exactly how long they are, but the defense field sobriety performance is not a very large part of the tape. So this gets more into the case law where there are cases that cite, that actually uphold the ability of prosecutors to present limited portions of a recording as part of explaining, as amplifying their arguments with respect to the evidence. And that has been approved in other cases. So it's not a situation where the entire tape was republished, and that is not permitted. With respect to the Fifth Amendment, there's no case cited that somehow referring to a non-testifying defendant's consciousness of guilt somehow violates his right against self-incrimination. Because as the Yeeham case demonstrates, although it's a very old case, it shows that that refers to compulsion. And just because a case is such, or the evidence is such, that a defendant may feel a need to explain his situation does not create impermissible compulsion to testify. That is still the defendant's voluntary choice, whether he wants to explain that or risk the fact that the case or the evidence might be used against him, such as inference of consciousness of guilt. And the idea that this is an absolute liability offense, well I found a case that shows that consciousness of guilt evidence, I believe that was like Rape Kings, could be relevant to proving whether just an offense was committed at all, not necessarily the fact that what was the defendant's mental state. So relevance is not restricted to mental state, because this offense has no mental state, does not preclude the state from presenting consciousness of guilt in a DUI context. With respect to the limits on closing argument, I think the defense claim here is that he was precluded from saying that age can affect performance. But when I read the transcript, I didn't get that conclusion. What I got was that the defense was not allowed to say that one is 23 years old, one has the ability to do many of the things, and the trial court said not in evidence. And the evidence was, though, there was some evidence that a person's age, and I quote this, might, end quote, affect ability to perform field sprite testing. And it seems what the defense wanted to do was essentially go much further than the evidence supported, which is simply what the defense was allowed to do is say that somebody might have trouble or perform differently as a result of their age. But it would be a vastly different thing to say that somehow any 45-year-old person like the defendant is going to have difficulties just because the person is 45 years old. And that's not supported by the evidence, and that would not be a permissible argument to make. And the trial court did not abuse its discretion in limiting the argument to what was only supported by the evidence. So the defendant was allowed to present the argument as far as the evidence would take it. So for that reason, no abuse of discretion. And eavesdropping, this is kind of a complicated issue because there are several components to it. It's kind of complicated first by the fact that the defendant didn't provide the transcripts of the hearings. And that complicates review because he claims that this is purely a statutory interpretation issue. There's no evidence whatsoever at issue. But yet he's got to show that, for example, he was told that the outset is apparent on the video. You're being audio and video recorded. Is that okay or do you understand that? And he agreed to that. So there's a consent issue here. And the fact also that the defendant wants to show that something that's allegedly eavesdropped is subject to suppression. He's got to show that an offense of eavesdropping was committed. I couldn't find a case on point. But it seems as if it should be the defendant's burden to essentially prove that the officer was guilty of a criminal offense, which is the felony offense of eavesdropping. Did the old eavesdropping statute prohibit recording after arrest? Well, the defendant's reading of the 14-3H section, and this is pre-amendment, is that he's reading into an exception somehow that it doesn't apply after arrest. But that's not what the language says. There's no explicit exception to say that this exemption stops applying once the handcuffs are on or once the person is put in the squad car. It says the exception refers to a person stopped for an investigation of an offense under felony traffic code. So it specifically says you can videotape after a stop, but it doesn't say you can videotape after an arrest. Well, actually, it doesn't say after the stop. It refers to a person stopped for an investigation. Well, this – it might be a different – There is a difference between a stop and arrest, but still the fact that the defendant had the handcuffs on and was put in the squad car doesn't mean that he somehow ceases being a person stopped for an investigation, which is what the old statute, pre-amendment statute, referred to. Did he lose, according to the defendant, the status of being stopped for investigation when the investigation remains ongoing? Why did they amend the statute? I'm sorry? Why did they amend the statute? I'm not sure exactly why they amended the statute, but I know that when they amended – they added the H-5, they took some stuff out of H. So they changed H and added H-5 at the same time. Sort of like in – I don't know if they were supposed to dovetail each other, but that doesn't necessarily mean that what happened here is not subject to the exemption in subsection H as it existed prior to amendment. So I guess what I'm trying to say is a person stopped for an investigation, and DUI investigation remains ongoing all the way up to the police station. So you think the amendment was unnecessary? The legislature was just wasting its time when it amended the statute. Well, it might not be unnecessary in the sense that it might make the law clearer, but that doesn't necessarily mean that it doesn't apply in this situation. It might have added additional scope above and beyond what might apply to this case. So therefore, just because the exemption applies in this case doesn't mean that the amendment didn't accomplish anything. My point is, if a person is stopped for investigation, a DUI investigation continues all the way to the police station, particularly when the defendant is making comments or is appearing drunk, and that sort of thing is circumstantial evidence that could be used, and once they get to the police station, they might have a custodial interview and ask him how many did you have to drink, and they also do breathalyzer tests. So because DUI's investigations have to continue, he still stopped for investigation. He still remains under that status, and there's nothing in the pre-amendment exemption that says that once the handcuffs go on or once you go in the squad car, the exemption stops applying. Because that limitation cannot be read in the plain text of that statute, this court has to apply the plain text of the statute, which is, was he still a person stopped for investigation, state's position is he was, all the way to the police station. So for that reason, you still can't show that it would be subject to suppression, because another reason, not just because of the consent, the lack of transcripts, and the failure to prove beyond a reasonable doubt that the officers were in fact felons that committed the felony of eavesdropping, because the right of suppression is tied directly to the fact that an offense was committed. So if you can't show beyond a reasonable doubt that a felony offense of eavesdropping was committed, there's no right to suppression, because it was not evidence derived from actual legal eavesdropping. But essentially the other reason is, because he's complaining about the video only portion of a recording, that the law of eavesdropping refers to audio, refers to conversation. Conversation between two or more people. And there are cases that say if somebody's just simply making statements or audible expressions, without an actual conversation between two people, the eavesdropping statute doesn't even, it's not even implicated. Just simply by recording, for example, somebody speaking, there's no conversation that's not subject to eavesdropping law. With respect to sentencing, it seems like one of the main arguments was, and I understand that's not their only argument, it's kind of a fairly compelling mitigating factor that they had with the defendant's father in that situation, although the law makes it clear that the existence of a mitigating factor doesn't require the sentence to be reduced. So for that reason, there was no abuse of discretion, but it seemed like one of their main arguments was that somehow there's no need to protect the public from the defendant's drunk driving, because he had no record whatsoever of unlicensed driving. Of course, I found in my review of the pre-sentence investigation, that he in fact had a prior conviction for driving while licensed suspended. So the fact that his license is now suspended as a result of this DUI does not mean that he's not going to offend again, and that the public doesn't need to be protected from his drunk driving history, from his tendency to drive drunk. So for that reason, this state requests this court to affirm, and if you have no further questions, I thank you for your time. Thanks. Thank you. Mr. Martinez. Thank you. With respect to the eavesdropping statute, Senator Hutchison wouldn't have a bill passed that expands the exemptions and specifically say now this is an additional thing they can do. It makes no sense to me. Do you have a presumption of rationality? I think so, Judge. No offense to anybody, but I don't get it. I would clearly say I'm expanding it. This exemption didn't exist in May. It exists in August, and somehow it clarifies it. No offense to anybody, but it makes no sense to me at all. The issue about video versus audio, if the video is obtained through an audio violation of the eavesdropping statute, that's sufficient. I've got case law in the briefs that explain that. This concept about, hey, you can only argue in closing, what the evidence was is nonsense. With all due respect, you can draw inferences. I mean, for them to suggest I couldn't draw the inference to the jury or argue the inference to the jury that look at the guy's ages and see how you think they do on the test, when they can make the inference that my guy who doesn't testify, he must know that he was guilty. That's why he didn't do these things. That wasn't an evidence. I mean, there's no evidence on that. So I guess it's okay for the state to not permit me to draw an inference at closing, but they can draw the inference on evidence that wasn't even presented at all. Didn't you try to argue that you'd have difficulty with the test or something? Yeah, I should have done that, and I moved on from that when there's objection. I should have. I was a mistake. I got carried away. I was thinking about the test where you count backwards from 84 to 67, and then you have to stop at 67. Good talk, Judge. If you go back to the alphabet, I can't, you know, it's pretty tough. You know, and I have to laugh, not laugh. I have to be concerned a little bit about if I read the brief and every one is harmless error, harmless error. Well, I mean, if you look at this, it might have been harmless error one, but collectively it's not harmless error. And the overwhelming evidence, well, I don't think this is overwhelming evidence. Officer Wall says, I'm handing you, Mr. Graves, to Officer Rich to see if you can drive. This is a guy in his driveway, men are trying to go to bed, but that's what the officer said. We need to see if you're okay to drive. So all the things that Officer Wall observed, all the things, alcohol he suggested to smell, none of which was sufficient to make an arrest, he handed it off to Officer Rich to do these things. But, you know, once again, when you look at this thing collectively, you can't say if the court permits all this impermissible testimony, when you look at all the impermissible testimony, it feels overwhelming. I mean, you can't do that. If you look at what the evidence was, this was not a breath test, he was driving the vehicle, he made a wide turn, and I looked at the tape, and he doesn't perform horribly on these fields of crime, because he's not falling over. He has a little struggle on a couple of things. But, you know, again, to me, I think juries really look at that. My gosh, this is a scientific test, and that's why I think it's really important that if you're going to permit it, and you're going to get the jury to look at this as something really important, it has to be a foundation. There was no foundation here. So now you have his opinion. He's drunk because his eyes jerked, and it's not overwhelming. What's scary to me is that if, you know, as an appellate court here, you have to really try to guess what impact this would have had on the jury. I don't think so. I think man's entitled to these things. This isn't asking a lot. You know, again, this isn't asking for Judge Klaus to give him a lot of things here. How about some questions at cross-examination? How about making sure that Officer Rich knows his stuff before you let their opinion? How about not replaying the entire evidence and telling me I can't have the whole tape played unless they give a closing argument? These aren't really big things. The state should be able to prove its case, and they would improve the case, I submit to you, absent all these errors. He needs a fair trial. He didn't get one. Give him one, Judge. Thank you. I take this matter under advisement and stand in recess until the readiness of the next case.